## Case No. 3,896.

### DICKINSON v. ADAMS.

[4 Sawy. 257;[1] 17 N. B. R. 380.]

District Court, D. California. · May 22, 1877.

BANKRUPTCY—FRAUDULENT TRANSFER—KNOWL-
EDGE OF VENDEE.

To entitle an assignee to recover of the vendee goods sold on the eve of bankruptcy, it must be shown, not only that the bankrupt intended to dispose of his property in fraud of the act [of 1867 (14 Stat. 517)], but that the defendant knew such to be his intention, and guiltily combined and colluded with him to carry it into effect.

J. H. Dickinson, in pro. per.

E. Moore, for defendant.

HOFFMAN, District Judge. Notwithstanding the very careful and elaborate argument made by the assignee in his own behalf, I have not been able to arrive at the conclusion which he so zealously contends should be drawn from the testimony. To maintain this action, he must show not only the insolvency of the bankrupts at the time of the sale in question, and that the defendant had reasonable cause to believe that such was their condition, but also that he knew that a fraud on the act was intended. He must, in the language of the supreme court, prove a "guilty collusion" between the parties. Clark v. Iselin, 21 Wall. [(88 U. S.) 360].

The counsel for the defendant has argued, that at the time of the transaction in question the bankrupts were not in point of fact insolvent. This conclusion he bases upon a comparison of the value of their assets with the amount of their individual and firm debts.

As intimated at the hearing, I am unable to assent to this conclusion. The sale to defendant was made after an attachment had been levied on a considerable part of their property. They were apprehensive of other attachments, and the avowed object of the sale was to obtain a sum in cash with which, as they hoped, they could make an arrangement with their creditors by paying fifty per cent. of their debts, and giving their notes for the balance.

They were disappointed in their expectations, but the fact that this was the best proposition they could offer seems to me to establish beyond question the condition of insolvency. That the bankrupts really intended to make and carry out, if accepted, this arrangement may be open to controversy. The circumstance that on the morning of the day on which the sale to the defendant was concluded, one of them paid to a creditor named Levy the whole amount of his debt, by transferring to him property sufficient to cover it, seems hardly consistent with their account on the stand of their motives and intentions.

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

But admitting that the proofs show that the debtors were insolvent, and even that a fraud on the act was intended by them, it must further be shown that the defendant knew of this fraudulent intent; in other words, that there was a guilty collusion between the parties to evade and defeat the operation of the act.

They were in no way indebted to the defendant. He was not related to them, and had had but slight business connection with them previously, and, so far as appears, no very intimate associations. He seems to have accidentally observed strangers in charge of their property, and, on inquiry, ascertained that it had been attached. They thereupon offered to sell him other property in their possession, fearing, as they said, other attachments, and in order to procure means to arrange their affairs in the manner which has been mentioned; the defendant swears that this was what he understood and believed to be the object of the sale, and the bankrupts testify that they so stated to him, and that such was their real intention.

If this was the real character of the transaction, it seems to me wholly unobjectionable. The bankruptcy law was not intended to prevent an embarrassed, or even an insolvent, debtor from converting a portion of his property into cash, in order to obtain means to appease his creditors by partial payments, and to procure a respite for the balance.

If a person to whom the property is offered under such circumstances cannot safely buy without becoming liable to restore it to the assignee, if bankruptcy supervenes, the mere fact of a present, and it may be a temporary, inability to meet his engagements, would practically deprive the struggling debtor of all power ·of extrication, would render his property virtually unavailable, and a temporary embarrassment might be converted into irremediable ruin. I think, therefore, that before calling upon the purchaser of the insolvent's property, under such circumstances, to restore it or its value, the proofs ought to be clear that there was a fraudulent design on the part of the debtor, and that this was known to and connived at by the purchaser.

The assignee has dwelt with great force and, I think, justice, on the conduct of the bankrupts, both before and after the sale to defendant, as indicating a design to put their property beyond the reach of their creditors. Within a very few days after the attachment they seem, by sales and fraudulent preferences, to have divested themselves of all their property not exempt from execution, and their design appears to have been to place themselves in this condition and then force from their remaining creditors an assent to any arrangement they might propose. But I cannot find any, or, at least, sufficient proofs that the defendant was aware of any such design. He was told by the bankrupts that the attachment was wholly unexpected

by them; that they had placed in the hands of the attaching creditors $6,000 worth of wheat, more than sufficient to cover their whole indebtedness; that if it had been sold at the proper time, a balance in their favor would have resulted; that they did not know it had been sold, as no account had been rendered by the pledgees, and that they did not believe they owed the latter anything.

They further stated that they had property enough to pay all their debts; and this statement the defendant swears he fully credited, not merely on the strength of their assurances, but from the knowledge he had of their property. He does not seem, however, to have had any very definite idea of the amount of their indebtedness.

The statement made by the bankrupts may very possibly have been true. The counsel for defendant has made a computation, by which he shows that on comparing the total amount of the joint and separate property of the bankrupts, with the aggregate of their joint and separate debts, the former was sufficient to satisfy the latter.

I have not thought it necessary to examine critically this computation. I refer to it merely to show that there is nothing preposterous, or even improbable, in the idea that both the bankrupts and the defendant may have believed that they had the means to satisfy all their creditors. I think it almost certain they could have done so, if they had been permitted to wait for the rise in the price of wheat which occurred in the fall of the same year.

The defendant had no knowledge of the previous payments by the bankrupts to certain of their smaller creditors, nor was he aware of the intention of Garrett Pierce to pay Levy in full by a sale of his separate property to him. So far as the proofs disclose, he may have supposed, as he swears he did, that the bankrupts having been unexpectedly attached for a debt of the existence of which they were not aware, and having property enough to meet their liabilities, were desirous of obtaining cash to raise the attachment already levied, and to avoid others, and thus save costs and expenses; that believing this to be the true state of the case, he consented to purchase the property they offered to sell him, and thus furnish them the money they required.

I am aware that the case is not free from suspicious circumstances; the chief of which is the statement by the defendant that the bankrupts owed him a small balance, when in fact he was then holding, subject to their order, a considerable portion of the purchase money for the property bought by him. His explanation of this statement is by no means satisfactory. He states that he considered himself at liberty, when annoyed by impertinent inquiries, to give an untruthful, or to use his own milder euphemism, an "optional" answer.

The previous and subsequent disposition of their property by the bankrupts, and especially the sale to Levy, suggests, as already intimated, the suspicion that their design at least was to put all their property out of their hands, and beyond the reach of their creditors, and thus force the latter to accept such terms as they might offer. I have given to these circumstances the most careful consideration, and have endeavored to form a just appreciation of their significance. I have come, on the whole, to the conclusion that they are insufficient to show what must be established by a preponderance of proofs, viz.: that not only the bankrupts intended to dispose of their property in fraud of the act, but that the defendant knew such to be their intention, and guiltily combined and colluded with them to carry it into effect. I feel some confidence that such would be the verdict of a jury under the proofs in this case, and under instructions from the court that the burden of proof was on the plaintiff.